No. 100,422

STATE OF KANSAS, *Appellee*, v. TINA M. HUFFMIER, *Appellant*.
(301 P.3d 669)

Opinion filed May 10, 2013.

*Reid T. Nelson*, of Capital and Conflicts Appellate Defender Office, argued the cause and was on the brief for appellant.

*Jason E. Geier*, assistant district attorney, argued the cause, and *Natalie Chalmers*, assistant district attorney, *Chadwick J. Taylor*, district attorney, and *Steve Six*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

BILES, J.: Tina Huffmier seeks review of a Court of Appeals decision affirming her conviction for driving under the influence of alcohol (DUI). *State v. Huffmier*, No. 100,422, 2010 WL 481257 (Kan. App. 2010) (unpublished opinion). She challenges the admission of certain evidence she claims portrayed her as a bad

mother and of low moral character, as well as the prosecutor's closing statements regarding that evidence. She claims further that the prosecution violated K.S.A. 60-447(a) (evidence of specific conduct to prove a defendant's character). We affirm her conviction.

## FACTUAL AND PROCEDURAL BACKGROUND

Huffmier was charged with DUI, refusal to take a preliminary breath test, and not wearing a seat belt. Those charges arose after she drove her two 4-year-old children to their father Brett, Huffmier's ex-husband, for visitation on June 11, 2006. In her first trial, a jury found her guilty of not wearing a seat belt and refusing to take a preliminary breath test but could not reach a unanimous verdict on the DUI charge. At a second trial, the jury convicted her on that charge, and it is now the focus of this appeal.

At the second trial, Brett testified that he spoke with Huffmier by telephone to arrange delivery of their children. He said he believed Huffmier sounded impaired, upset, and irritated, and would not tell him where she was. Once they agreed where to meet for the exchange, Brett called the Shawnee County Sheriff's Office to have officers present because he believed Huffmier was intoxicated.

An officer at the scene testified that he did not see Huffmier having any problems operating her vehicle when she approached, but as he got closer to explain why law enforcement officers were present he noticed a strong odor of alcohol coming from Huffmier's car. The officer said Huffmier was cooperative but had bloodshot eyes, slurred speech, and told him she had been drinking but was not drunk. The officer testified that based on Brett's statements and the officer's observations, he believed Huffmier was impaired and asked her to perform four field sobriety tests:

1. ABC test. The officer testified that he asked Huffmier to recite A through Q, but she recited A through Z. The officer said Huffmier's performance indicated impairment.

2. Finger dexterity test. The officer testified that even though Huffmier said she understood the instructions to make contact with her fingers and count out loud at the same time, the touching of her fingers was inconsistent and that Huff-

mier was "fumbling " and "sliding" across her fingers—an indication she was impaired.

3. One-leg stand. The officer testified Huffmier showed two clues of impairment: swaying and putting her foot down twice.
4. Walk and turn. The officer testified that Huffmier made four out of a possible eight mistakes: not keeping her balance during the instructions, starting too soon before being told to begin, making an improper turn, and taking the wrong number of steps—10, instead of 9. The officer also said Huffmier made an error during the actual walking portion of the test.

Brett also testified about his observations regarding Huffmier. He said that during the exchange with the children, "it was quite obvious she had been—she was quite intoxicated." He noted Huffmier had "a strong odor of alcohol" and that her speech "was kind of slurred." Brett stated further that from her mood swings and the way she talked, it was "extremely obvious" that she was intoxicated. He also told the jury that he had known her for 10 years, had seen her both intoxicated and sober, and definitely knew the difference.

At various points during trial, the prosecutor asked certain witnesses about Huffmier's child visitation schedule and her personal relationships. Huffmier now argues testimony with two witnesses conveyed irrelevant and prejudicial evidence that led the jury to conclude she was a bad mother and of low moral character. We describe that testimony in detail to address Huffmier's arguments, but must distinguish the issues preserved with a timely objection.

First, she challenges the prosecutor's questioning of Brett about Huffmier's visitation arrangements with their children after her arrest. That subject arose in the following segment of testimony with Brett:

"Q. [Prosecutor]: Did you ever—she had a right to see the children after this?
"A. [Brett]: Yes.
"Q. Is that a fair statement?
"A. You betcha.
  "[Defense counsel]: I will object as to the relevance of this questioning.
  "THE COURT: Overruled. Go ahead.

"Q. So, you say about two months ago?

"A. Uh-huh.

"Q. The defendant asked for a different visitation, is that a fair statement?

"A. Yes, ma'am.

"Q. And when did that occur?

"A. About two months ago.

"Q. And was that here in Shawnee County, or another county?

"A. It was in Osage County.

"Q. Okay. And was anything changed?

"A. Yeah, after 2006, I told her that I didn't trust her having the kids overnight, and if she wanted to see the kids—

"[Defense counsel]: I will object.

"THE COURT: I will sustain. This is irrelevant. The jury will disregard.

"Q. Did the Court change visitation?

"A. Yes.

"[Defense Counsel]: Again, I will object.

"THE COURT: I will sustain the objection. I will sustain the objection."

Second, Huffmier claims error when the prosecutor asked Brett about Huffmier's living arrangements with a man identified as "Al." The dialogue at issue was:

"Q. [Prosecutor]: Do you know who Al is?

"A. [Brett]: It was the guy that she was living with at one time.

"Q. Had you ever met him?

"A. Prior to that, no.

"Q. Right, on June—in June of '06, did you know an Al?

"A. No."

Immediately after this exchange, Huffmier's third claim of error occurred with the prosecution's unanswered question regarding the girls' condition when they were delivered to Brett. The prosecutor asked:

"Q. [Prosecutor]: Were the girls in good shape when you got them back?

"[Defense counsel]: Again, Your Honor, object as to the relevance.

"THE COURT: I can't think of any relevance, I'll sustain."

Fourth, the prosecutor asked the arresting officer about Huffmier's third child, S.F., whom Huffmier had with another man, and discussed Huffmier's restraining order against that man. The challenged dialogue was:

"Q. [Prosecutor]: Was there any discussion that you had with Al or the defendant reference a [S.F.]?

"A. [Officer]: Yes, [S.F.] is I believe a third child of the defendant's, and she was at the residence where Al lives at.

"Q. And did Al bring the child to where you were at?

"[Defense counsel]: Your Honor, the relevance of this?

"[Prosecutor]: Well, Judge, it kind of puts in context the video.

"THE COURT: The what?

"[Prosecutor]: The video because there is a lot of discussion.

"THE COURT: I'll allow it.

"A. [Officer]: [S.F.] was not there.

"Q. Did you have any conversation with the defendant reference the father of [S.F.]?

"A. The biological father of [S.F.], whose name was later identified as last name— I don't know how to pronounce it so I will spell it—[F.], first name Dave.

"Q. And did she give you that name?

"A. No, he actually called dispatch stating that he learned that Tina was being arrested for DUI.

"Q. And did he—did you have any conversations with this man?

"A. No.

"Q. This Dave?

"A. No.

"Q. Did Al seem to know Dave?

"A. She said that Dave and her had a restraining order in effect, and that she did not want Dave to come take her daughter, [S.F.], from the house in Montara.

"Q. Were you able to confirm that there was a restraining order?

"A. No, not that there was one in effect pertaining to the child, no.

"Q. Anything in reference to her and Dave?

"A. I believe that we had contacted Osage County, but they had no record of anything on file at the time.

"Q. So could you confirm anything that she was telling you reference this Dave and her child—

"A. No.

"Q.—[S.F.]?

"A. No."

Fifth, there was testimony about Huffmier's demeanor after her arrest. The challenged testimony occurred after the prosecutor asked the officer what happened following Huffmier's arrest:

"Q. [Prosecutor]: Once that kind of got worked out, what did you do with the defendant?

"A. [Officer]: I transported her to the Department of Corrections. While en route there, I had to call dispatch and advise them that she was being uncooperative, and have a team meet me at the Department of Corrections.

"Q. What do you mean by 'uncooperative'?

"A. I advised [Huffmier], the defendant, that Dave was coming to Montara to pick up [S.F.] because he was the biological parent, and there was nothing that I could confirm to state that she had residential custody or any sort of custody saying Al could be—could take care of this child, so Dave was going to have to pick it up, and she got upset.

"Q. When you say you called the jail?

"A. I radioed in to dispatch, and advised them to advise the jail that I would be en route with an uncooperative subject.

"Q. And what does that do at the jail? Do they do anything?

"A. Just a safety precaution so they can come out with a video camera and a medical team and jail personnel to make sure that they get the defendant out safely and into the jail.

"Q. And once you arrived at the jail, was this team there?

"A. Yes.

"Q. And did the defendant—how did they—or how did she act?

"A. Once she saw the team, she calmed down. She was still upset and crying, and they escorted her in safely."

During closing arguments, the prosecuting attorney referred to the child visitation issue and Huffmier's postarrest demeanor without objection. The prosecution then brought out that Huffmier refused to tell the arresting officer Al's last name and argued that Huffmier may have even been too drunk to remember the child's name. The prosecutor said, "[W]here it comes down is she wasn't going to tell them where that baby was. She never did. We never found out where the baby was from her." The prosecutor continued by saying, [S]he said . . . [she] would have just kept driving. Her responsibility was to get those kids back to their father. That's poor decision making. You can consider common sense."

The jury found Huffmier guilty of DUI. The Court of Appeals affirmed her conviction. *Huffmier*, 2010 WL 481257, at *6.

Addressing each of the arguments, the panel held that it was error to admit evidence about the child visitation schedule because it was immaterial to the DUI charge. But the panel also determined its admission did not affect the trial's outcome or deny Huffmier substantial justice. It held further that because the district court sustained the defense objections and admonished the jury to. disregard the objectionable evidence, reversal was not required unless the statements in issue were so prejudicial as to be incurable. The panel further found the only potentially prejudicial statement was

Brett saying he did not trust Huffmier to have the children over-night after the DUI, but ultimately it held that was not so preju-dicial as to be incurable. 2010 WL 481257, at *2.

As to Brett's testimony regarding Huffmier's living arrangements with Al, the panel held this questioning was irrelevant and noted the district court properly sustained the objection to it. The panel also noted the trial court instructed the jury prior to deliberations to disregard testimony not admitted into evidence. The panel held Brett's statements were not so prejudicial as to require a new trial. The panel further observed that Brett did not answer the specific question about whether the children were in good shape when he got them back from Huffmier and that the remaining testimony from Brett about Al was benign. 2010 WL 481257, at *2.

Regarding the officer's testimony concerning Huffmier's living arrangement with Al and her lack of cooperation while being trans-ported to the police station, the panel analyzed Huffmier's argu-ment as if the testimony had been admitted over Huffmier's ob-jection, even though there was no objection lodged. The panel first determined that because the evidence was immaterial to the DUI charge, it was error for it to have been admitted. But the panel held this testimony's erroneous admission did not affect the trial's outcome or deny substantial justice, particularly because defense counsel commented on the same evidence during closing argu-ments. 2010 WL 481257, at *3.

As for Huffmier's challenge to the prosecutor's closing state-ments, the panel observed that Huffmier had not made any pros-ecutorial misconduct argument and had simply framed the issue as if the prosecutor had offered facts into evidence during closing. The panel held that because Huffmier's concerns about the pros-ecutor's statements were based on their improper admissibility as evidence, it would not convert the issue into a prosecutorial mis-conduct claim. It noted a prosecutor's statements are not evidence and that the jury was so advised. 2010 WL 481257, at *3-4.

Finally, the panel rejected Huffmier's argument that the pros-ecution violated K.S.A. 60-447(a), which prohibits proof of a char-acter trait by specific conduct, because Huffmier's trial objections were based solely upon relevance. Therefore, the panel declined

to address Huffmier's claim because she could not object to the evidence on one ground at trial and then assert a different ground on appeal. 2010 WL 481257, at *4.

Huffmier sought review from this court, challenging the panel's decisions regarding her claims of irrelevant and prejudicial testimony. She did not seek review of an additional argument rejected by the panel concerning the admission of what she characterized as opinion testimony about her intoxication. Huffmier also filed a motion to strike references she had made in her petition for review to a videotape that was shown to the jury because it was not included in the record on appeal. We granted Huffmier's petition for review and the motion to strike. Our jurisdiction arises under K.S.A. 20-3018(b) (review of Court of Appeals decision).

## ADMISSIBILITY OF EVIDENCE

At the outset we must consider whether Huffmier failed to make specific and timely objections as required by K.S.A. 60-404 to the testimony she challenges on appeal. That statute provides:

"A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence *unless there appears of record objection to the evidence timely interposed and so stated as to make clear the specific ground of objection.*" (Emphasis added.)

Several of Huffmier's arguments fail on this basis. The first such problem concerns Brett's testimony about Al, which Huffmier argues was irrelevant and prejudicial because it showed she was living with a man whom the father of her children did not even know. But Huffmier did not object at trial to this testimony. As shown in the record, the prosecutor asked Brett whether he knew Al, and the answer to that question was: "It was the guy that she was living with at one time." To the extent Huffmier argues it was irrelevant and prejudicial for the jury to hear testimony that Huffmier was living with a man, that information came into evidence without a timely and contemporaneous objection as required by K.S.A. 60-404.

The record further reflects that without objection, Brett was asked next whether he had ever met Al prior to Huffmier's arrest, to which he responded, "Prior to that, no." Similarly, when the

arresting officer was asked, "Was there any discussion that you had with Al or the defendant reference a [S.F.]," there was no objection. And the response was, "Yes, [S.F.] is I believe a third child of the defendant's, and she was at the residence where Al lives at." The only other times Al was mentioned were unrelated to any living arrangement with Huffmier. We hold this issue was not preserved as required by statute due to the lack of an objection.

Huffmier also claims the testimony about S.F. in this context was similarly irrelevant and prejudicial. But again, trial counsel did not make a timely and specific objection to the arresting officer's testimony during which S.F. was identified as Huffmier's third child. We hold any challenge to this testimony was not preserved. The same is true as to testimony about the restraining order in this colloquy, which occurred well after the objection to a question unrelated to the restraining order.

A similar failure to object infects Huffmier's claims regarding evidence about her uncooperative demeanor and the arresting officer's need to have dispatch request a support team to help get Huffmier inside the jail safely. The record reflects no challenge to any of the six questions and answers in the testimony at issue. The Court of Appeals erred in treating this testimony as if there had been an objection made to it that the district court overruled. The argument was not preserved under K.S.A. 60-404.

Accordingly, we are left to consider only the claims of error concerning testimony about Huffmier's child visitation arrangements and the prosecutor's unanswered question regarding whether the children were in "good shape" when they were returned to Brett.

*Standard of review for remaining claims*

The Court of Appeals panel, citing K.S.A. 60-401(b) and caselaw applying that statute, held that the questions regarding the visitation schedule and whether it changed after Huffmier's arrest were not material to the DUI charge and that it was error for the trial court to have overruled defense counsel's initial objection to this inquiry. *Huffmier*, 2010 WL 481257, at *2. The State did not seek review of those holdings, so we do not consider whether the panel erred in this regard. Supreme Court Rule 8.03(g)(1) (2012 Kan.

Ct. R. Annot. 75); see *State v. Allen,* 293 Kan. 793, 795-96, 268 P.3d 1198 (2012) (party must allege an issue was erroneously decided to be properly before the Supreme Court on petition for review); *State v. Roberts,* 293 Kan. 29, 33, 259 P.3d 691 (2011) (issue decided in defendant's favor not cross-petitioned by the State and not before this court).

But a determination that the district court erroneously admitted this testimony does not automatically entitle Huffmier to a new trial. We also must consider whether the panel erred in its determination that the trial court's erroneous admission of this evidence was harmless. See *State v. Longstaff,* 296 Kan. 884, 895-96, 299 P.3d 268 (2013). The applicable harmless error standard is defined in K.S.A. 60-261:

"No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties."

This statutory nonconstitutional harmless error analysis requires us to determine whether there is a reasonable probability that the error affected the outcome of the trial in light of the entire record. See *State v. Ward,* 292 Kan. 541, 569-70, 256 P.3d 801 (2011) (comparing the more stringent test when the error infringes on rights protected by the United States Constitution), *cert. denied* 132 S. Ct. 1594 (2012). In this analysis, we are concerned only with undue or unfair prejudice. See *State v. Prine,* 287 Kan. 713, 736, 200 P.3d 1 (2009). The burden of demonstrating harmlessness under K.S.A. 60-261 is on the State in this instance as the party benefiting from the error. *State v. McCullough,* 293 Kan. 970, Syl. ¶ 9, 270 P.3d 1142 (2012).

*Testimony about visitation and asking whether the girls were in good shape*

The district court initially overruled Huffmier's objection that her visitation rights were irrelevant, which permitted the State to

elicit testimony from Brett that Huffmier requested a change to her child visitation schedule about 2 months before her second trial. The prosecutor then asked whether anything had changed, to which Brett responded, "Yeah, after 2006, I told her that I didn't trust her having the kids overnight, and if she wanted to see the kids—." At that point, defense counsel again objected, and the trial court sustained that objection by stating, "This is irrelevant. The jury will disregard." The State then immediately continued with the same line of questioning by asking, "Did the court change visitation?" And Brett responded, "Yes" before the defense could again object, and the court again sustained that objection.

The evidence admitted over defense counsel's objections was that since Huffmier's arrest: (1) Huffmier's ex-husband did not trust her with their children overnight; and (2) there had been some change of unspecified character in the court-ordered visitation. The issue for our determination is whether there is a reasonable probability the erroneous admission of this information affected the trial's outcome in light of the entire record. See *Ward*, 292 Kan. at 569-70.

The State argues this testimony was harmless. It notes the only potentially negative opinion given after the first objection was overruled was that Brett "didn't trust" Huffmier to have their children overnight after the DUI and that this statement was immediately followed by a second objection which the trial court sustained and admonished the jury to disregard. The State claims this cured any prejudice. The Court of Appeals also characterized Brett's statement as being "potentially prejudicial" but not so negative as to be incurable. *Huffmier*, 2010 WL 481257, at *2.

We have held that a court's admonition to the jury normally cures the prejudice from improperly admitted testimony. See *State v. Gleason*, 277 Kan. 624, 642, 88 P.3d 218 (2004). But our rejection of Huffmier's argument is more firmly grounded in our review of the entire record supporting her conviction. That evidence includes the errors Huffmier made on the field sobriety tests; her admission to drinking; the officer's observations concerning her slurred speech and bloodshot eyes; and Brett's testimony concerning his observations before and at the scene about her impairment.

Similar evidence has been held to be substantial, supporting a DUI conviction. See, *e.g.*, *State v. Stevens*, 285 Kan. 307, 317, 172 P.3d 570 (2007) (DUI conviction supported by substantial evidence when it was shown defendant strongly smelled of alcohol, had beer cans and half-empty whiskey bottle in his car, admitted to drinking, stumbled exiting the vehicle, and was unable to complete field sobriety tests); see also *State v. Ward*, 233 Kan. 144, 146, 660 P.2d 957 (1983) (DUI can be established by circumstantial evidence only). And based on the substantial evidence that Huffmier was driving under the influence, we hold there is no reasonable probability the trial's outcome would have been different. The trial court's mitigating admonition to the jury to disregard this testimony only bolsters that conclusion.

This leaves us to consider the prosecutor's unanswered question when Brett was asked, "Were the girls in good shape when you got them back?" Huffmier claims this question put before the jury an implication that Huffmier was a poor mother but does not claim asking the question constituted prosecutorial misconduct. See, *e.g.*, *State v. Summers*, 293 Kan. 819, 831, 272 P.3d 1 (2012) (considering prosecutor's unanswered question after objection was sustained through prosecutorial misconduct rubric).

At Huffmier's first trial, which resulted in a hung jury on the DUI charge, Brett was asked the same question; but it was not objected to, so an answer was given. The exchange between the prosecutor and Brett at the first trial was as follows:

"Q. Were the girls in good shape when you got them?
"A. Yeah. I mean, they were dirty, and their clothes were dirty, they didn't have their socks and shoes on, she didn't have them with her, but as far as cuts, bruises, abrasions, anything like that, no, they were fine."

It is difficult to see how just asking the question in the second trial could prejudice the outcome when both the question and answer were admitted without objection in the first trial which ended with a hung jury on the DUI charge. And Huffmier makes no specific argument to refine her general claim that the evidence at trial discussed above portrayed her as a bad mother.

In light of the DUI evidence, we have no hesitation in holding that there is no reasonable probability that this unanswered ques-

tion affected the trial's outcome. This conclusion is reinforced by the trial judge sustaining the objection to the question, while adding, "I can't think of any relevance [to the question]."

*Prosecutor's Statements*

Huffmier next claims the prosecutor's closing argument also referenced and emphasized the testimony discussed above by saying:

"Well, what was her response when they—the police were wanting to find out about [S.F.], the little baby. Where is she? Just call Al, she says. Just call him. He'll come. Then what did they say? *Well, what's Al's last name? This is what she says. I really couldn't tell you his last name.*

"Now, one, maybe she didn't know his last name. That's a possibility. Or maybe it's because she was too drunk to remember it. But where it comes down is she wasn't going to tell them where that baby was. She never did. We never found out where the baby was from her.*

"And Brett said I was worried she probably wouldn't tell the cops where my kids were when I talked to her and, boy, you know what, he was right." (Emphasis added.)

The prosecutor later stated:

"Instruction Number 7 says use your common sense and experience. We can only speculate how she would have acted if she hadn't have been drinking. Even if you listen to what she said later, she said if I knew this, I would have driven by, I would have just kept driving. *Her responsibility was to get those kids back to their father. Where was that decision making and good judgment even there?*" (Emphasis added.)

But Huffmier characterizes the prosecutor's arguments as statements of evidence that prejudiced her, and does not challenge the panel's determination not to address her arguments as prosecutorial misconduct. Accordingly, the prosecutorial misconduct avenue of attack is waived. See Supreme Court Rule 8.03(g)(1); *Allen*, 293 Kan. at 795-96.

As to the argument that the prosecutor's statement constituted evidentiary error, we can quickly discard this claim because there was no objection made, so that issue was not preserved. See *State v. Raskie*, 293 Kan. 906, 915, 269 P.3d. 1268 (2012) (failure to preserve for appellate review argument concerning evidentiary error contained within prosecutor's closing statement under K.S.A.

60-404 when defendant failed to object). We hold the Court of Appeals correctly rejected this claim of error.

*K.S.A. 60-447*

As a final point related to the challenged statements, Huffmier argues the evidentiary "errors" she recites from the testimony elicited from the two witnesses and the prosecutor's closing statement amounted to a violation of K.S.A. 60-447 because the evidence showed specific conduct to prove she was an irresponsible mother. But as the record reflects, and as the panel correctly held, Huffmier's specific grounds for objecting at trial were for relevance— not a K.S.A. 60-447 violation. See *Huffmier*, 2010 WL 481257, at *4. A defendant may not object to the admission of evidence on one ground at trial and then assert a different ground for objection on appeal. *State v. McCaslin*, 291 Kan. 697, 707, 245 P.3d 1030 (2011). The record reflects no instance in which defense counsel asserted K.S.A. 60-447 as a basis for any objection and to that extent failed to preserve this argument for appeal under K.S.A. 60-404.

Affirmed.