NOT DESIGNATED FOR PUBLICATION

No. 115,989

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

BARCLAY GARRETT MEAD,
*Appellant.*

MEMORANDUM OPINION

Appeal from Jefferson District Court; GARY L. NAFZIGER, judge. Opinion filed September 15, 2017. Affirmed.

*Barclay Mead*, appellant pro se.

*Thomas E. Knutzen*, of Jefferson County Attorney's Office, and *Derek Schmidt,* attorney general, for appellee.

Before MALONE, P.J., LEBEN and BRUNS, JJ.

PER CURIAM: Following a trial before a judge, the district court found Barclay Mead guilty of battery and disorderly conduct based on an altercation at a motorcycle rally. On appeal, Mead argues that the evidence wasn't sufficient to support these convictions. But we are required on appeal to take the evidence in the light most favorable to the State; that's because the fact-finder (here, the trial judge) found the facts in the State's favor by convicting Mead. In that light, there was sufficient evidence to convict Mead: He committed battery by making physical contact with a private security guard at the bike rally in a rude and angry manner; witnesses said he was yelling and screaming and flailing his arms when he made contact. And he committed disorderly

conduct based on noisy conduct that would reasonably alarm another person; witnesses said he came toward several people while yelling, screaming, and flailing his arms in an aggressive manner.

Mead makes several other arguments on appeal, but most of them were not raised before the trial court and either are not properly before us or can't be fairly evaluated on the record before us. We have carefully reviewed all of Mead's arguments and have found no reversible error in his trial. We therefore affirm the district court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

Mead was charged with battery and disorderly conduct stemming from an incident that happened at a motorcycle rally in the late night and early morning hours of September 6 and 7, 2015. The charge was tried to the court, sitting without a jury. Because Mead argues on appeal that the evidence wasn't sufficient to convict him, we necessarily review the evidence in some detail.

Del White, a volunteer security guard at the rally, testified to one version of the events. He said that around 11:30 p.m. on September 6, another security guard, Bill Cooper, reported that someone in a golf cart had "blown through a gate" and entered into a motorcycle-only area. According to White, Cooper told him the golf cart had no lights and was driving fast and erratically. Cooper asked for help with the situation and, according to White, said, "There's no emergency, but the person is getting pretty mouthy with me at this time."

When White arrived at the area, he saw Mead and Cooper engaged in "a very heated conversation back and forth," cursing and yelling at one another. He testified that the golf cart was just off the roadway and a gentleman was sitting in it. White told Cooper that he would handle the situation, so Cooper went back to his post. White

2

testified that he explained to Mead that Mead needed to remove the golf cart from the area but Mead "just rambled and ranted" that he could do this and everyone kept hassling him and wouldn't leave him alone. White testified that he believed Mead was intoxicated or under the influence of something else as Mead was not "behaving as a sober person would."

According to White, Mead said he couldn't move the golf cart because it was out of gas. White told Mead to walk back to the camp and get gas for the cart so he could drive it out of the area. White testified that the other person in the golf cart said he would go get gas, so White thought that the matter was resolved and started walking away. As he was walking away, White said he heard arguing behind him, so he turned around to speak to Mead again. White testified that, at that point, "[Mead] just blew up, and he jumped at me and bumped into me and it was something about . . . .  'Why would you go behind my back? Why would you do this?'" White claimed that Mead bumped his chest into White's shoulder while shouting at White in a "very threatening, very belligerent" manner and was within 6 inches from White's face.

In response, White said he stuck his flashlight under Mead's chin to create some space between them. White testified that most people at the rally have at least one knife on them, so he wanted to get control of Mead's arms in case Mead reached for a weapon. During the resulting struggle, White and Mead ended up in the roadway and were struck by a motorcycle. White testified that after they had fallen to the ground, he tapped his flashlight against Mead's forehead and told Mead to knock it off. White also testified that he put his hand on Mead's neck to hold him down and told Mead to stop fighting while Mead said he couldn't breathe. White called for an ambulance after noticing that Mead was bleeding from his head.

Rick Gitchel, another security guard, also responded when Cooper asked for additional security assistance. He testified that when he arrived on the scene, he saw

Cooper and Mead arguing and swearing at one another. Gitchel said that he joined White in talking to Mead about moving the golf cart, and Gitchel said he had believed they had the situation under control. He reported that when he and White turned to leave, Mead shouted something at them, but he couldn't recall what was said. Gitchel said that when White turned back to Mead, Mead headed towards White and reached to grab White's face or throat. According to Gitchel, White put Mead in a headlock and took him to the ground. Gitchel said that as White and Mead were going to the ground, they hit the front wheel of a motorcycle that had pulled up in the area and knocked it over. Gitchel testified that he believed Mead was injured when he hit the motorcycle. On cross-examination, Gitchel said that White hit Mead with the flashlight once while the two were going to the ground.

Ronald Vawter, head of security for the rally, also witnessed the incident and testified for the State. He reported to the scene after getting a call on the radio about a disturbance. When he arrived, he saw White and Gitchel talking to Mead about the golf cart and Mead was arguing loudly. According to Vawter, the scene "seemed to get loud at times and then it would calm down." In his opinion, White was doing a good job of deescalating the situation and calming Mead down. Vawter testified that when they went to leave, Mead "got real loud" and "was coming at us." According to Vawter, Mead was out of control—walking fast towards them, flinging his arms, yelling, and cussing. Vawter testified that White stepped towards Mead and took him to the ground. Vawter said he believed that if White hadn't stepped in, Vawter would have been hurt. Vawter said that Mead hit his head on the front wheel of a motorcycle that was trying to going around them as he went to the ground. Vawter said White tapped Mead twice on the top of his head or his forehead with the flashlight as they were going to the ground. He said he thought that Mead's head injuries were from hitting the motorcycle because there was a lot of blood on the brake calipers and brake rotors.

Mead called two witnesses who saw the incident. Todd Meyer, the other person in the golf cart, testified that he was driving the golf cart and was not driving recklessly. Meyer and Mead had known each other since childhood. According to Meyer, the golf cart broke down and a security guard approached and told them to get the vehicle out of the middle of the road. Meyer said that the security guard approached Mead, "poked him in the throat with the flashlight, hit him in the head, and [then Mead] went down." Meyer testified that at first there was only one security guard and then others showed up. He said that the security guard who hit Mead hit him very hard with the flashlight, and Meyer saw a lot of blood. According to Meyer, the motorcycle hit Mead after Mead was already on the ground. Meyer said that he tried to film the incident on his cellphone but it was too dark and too noisy from other motorcycles.

Mead's other witness was Matthew Trainor, a vendor at the rally. Trainor said that he had never met Mead before and was sitting outside in a lounge chair by his motor home when he saw an altercation. He testified that he heard a very loud noise and then heard someone say, "'Take him down.'" Trainor said that he saw a security guard hit Mead very hard with a flashlight practically knocking Mead unconscious before he heard someone say, "'Take him down.'" According to Trainor, someone then tackled Mead to the ground and then the motorcycle hit him. He said that the security guard hit Mead again while they were on the ground. Trainor testified that the security guard was the aggressor in the altercation he witnessed. He also characterized the security force at the rally as unprofessional, difficult, and unpleasant to work with. Trainor said that Mead was bleeding heavily from the top of his head. He believed that the blood came from the blow from the flashlight and not from being hit by the motorcycle because he saw blood before Mead was hit by the motorcycle.

In addition to these witnesses, Mead took the stand in his own defense. Mead said he was a member of ABATE (the group that hosted the motorcycle rally) and had volunteered to mow and to set up things before the rally for several years. Mead owned a

nearby restaurant and saloon and an IT consulting firm. He said that on the night of the altercation, he and Meyer went to the rally after closing up the restaurant. According to Mead, they took a three-wheeled golf cart to get there and Meyer drove. As they were driving, the golf cart "started cutting out real bad." Mead said he told Meyer to turn into a vendor area where a sign was posted "Four-Wheel Vehicles Not Allowed" to get the golf cart off the main street. He refuted the claims that they were speeding around the corner in the golf cart; he said the cart would have flipped due to its design if driven too fast around a corner.

Mead said that after they had pulled off the road onto the shoulder and grass, Bill Cooper "came at [them] yelling and screaming very loudly" to get the cart moved. Mead said he told Cooper that the cart had run out of gas or broken down and that he would get it out of there as soon as they could. He said Cooper replied that until then, they would drag the golf cart away. Mead testified said he told Cooper that they couldn't do that because dragging the golf cart would damage it. Mead testified that Cooper said, "'I'm calling security, and you're going to be sorry.'" White, Gitchel, and Vawter then responded to the scene.

According to Mead, White was at first listening to what Mead had to say, but the argument turned violent. Mead testified that he told White, "I've had enough of this" and told White to call the site coordinator on the radio to settle the matter while turned and pointing towards the site coordinator's campsite. Mead testified that, in response, White said, "'I've had enough of his mouth'" and "'Take him down.'" Mead said White then shoved the flashlight into Mead's throat and hit Mead on the top of the head with it. Mead said White then got him in a headlock and hit him again with the flashlight before they fell to the ground and were hit by the motorcycle. Mead said that he never bumped into White and did not swing at him, lunge at him, or grab at his face.

As a result of the incident, Mead received two cuts on his head that required 26 staples. In Mead's opinion, one of the cuts was from the flashlight and the other was from the motorcycle. Mead also testified that he wasn't drinking that night as he was on blood thinners for a recent heart attack; he said that some symptoms of his multiple sclerosis and side effects of medications could sometimes be confused for signs of intoxication. Mead said he thought that the police were biased against him and more willing to reject evidence suggesting White was the aggressor because Mead had recently been charged with violating a protective order and was out on bond at the time of these events.

The State called Captain George Welch from the sheriff's department to testify as a rebuttal witness. Welch testified that the other person in the golf cart told him that Mead was driving and had been drinking that night. According to Welch, the other person claimed to have recorded the events but refused to turn over the video; Welch never got the other person's name. Welch said that Mead had bloodshot, watery eyes and clenched his teeth while talking to Welch, which Welch believed was to avoid breathing on the officer. Welch testified that police intended to test Mead for alcohol consumption, but Mead became unresponsive as they were getting the test ready. Welch also reported that police found a beer bottle and a small glass jar that contained "green, leafy vegetation" in the golf cart. Welch testified that the green, leafy vegetation was not tested because no one was criminally charged for it.

After hearing all the evidence, the district court found Mead guilty of both charges, battery and disorderly conduct. The court first discussed that Mead had driven a vehicle into an area where he was not permitted to be and, when stopped, "became confront[ational], belligerent, recalcitrant, loud, [and] argumentative." The court found, based on witness testimony, that Mead "came toward the victim, grabbing toward the victim's throat, yelling, screaming, out of control, arms swinging, walking fast and menacingly." The court said it concluded beyond a reasonable doubt that this resulted in

7

battery as charged—Mead made unlawful and knowing physical contact with White in a rude, insulting, or angry manner.

The court also concluded beyond a reasonable doubt that Mead had committed disorderly conduct because he had "intentionally, knowingly engage[d] in noisy conduct of such a nature that would tend to reasonably arouse alarm or resentment in others" by his "verbal comments and barrage" that "were essentially fighting words."

The district court sentenced Mead to six months on probation, but if he failed on probation, he would have to serve the underlying sentence of six months in the county jail.

Mead then appealed to our court.

ANALYSIS

I. *Sufficient Evidence Supports Mead's Convictions for Battery and Disorderly Conduct.*

Mead first contends that no rational fact-finder could have convicted him of battery and disorderly conduct because the evidence was insufficient to support the convictions. He also argues that he is immune from conviction because he was defending himself, his occupied vehicle, and his personal property.

When the sufficiency of the evidence is challenged in a criminal case, an appellate court must look at the evidence in the light most favorable to the State since the fact-finder (here the district judge) has ruled in the State's favor. We then determine whether a rational fact-finder looking at the evidence in that light could have found the defendant guilty beyond a reasonable doubt. *State v. Kendall*, 300 Kan. 515, 523, 331 P.3d 763

8

(2014). We do not reweigh evidence, resolve conflicts in the evidence, or make witness-credibility determinations. *State v. Belt*, 305 Kan. 381, 397, 381 P.3d 473 (2016).

Let's start with the battery charge. To convict Mead of battery, the State had to prove beyond a reasonable doubt that Mead knowingly caused physical contact with White in a rude, insulting, or angry manner. K.S.A. 2016 Supp. 21-5413(a)(2).

All three security guards reported Mead yelling and making contact with White, even though the stories varied considerably. White said that Mead charged and bumped into him while yelling and shouting at him. Gitchel reported that Mead yelled something at them as they were walking away, causing them to turn around. When Mead and White started heading towards one another, Gitchel said that Mead grabbed for White's face or throat. Vawter reported that he heard Mead yell something and then saw Mead coming at them, walking fast, flinging his arms, and yelling and screaming. According to Vawter, White took at least a step toward Mead to stop him as Mead was still coming at them, and Mead and White made contact with one another at the same time.

In finding Mead guilty, the district court credited the version of events portrayed by these witnesses: that Mead made physical contact with White while Mead was yelling, screaming, grabbing at White's throat, swinging his arms, and generally acting out of control. Viewing the evidence in the light most favorable to the State, a rational fact-finder could conclude beyond a reasonable doubt that Mead knowingly caused physical contact with White in a rude, insulting, or angry manner.

To be sure, Mead makes some good points in his brief. For example, he notes that White's written statement to police didn't say that Mead had initiated physical contact, even though White testified differently at trial. Mead argues that because White's story changed, he wasn't a credible witness. Similarly, Mead attempts to discredit Gitchel's and Vawter's testimony by arguing that from their vantage points, they could not fully see

9

what was happening. But what Mead is doing here is asking this court to reweigh evidence, resolve conflicts in the evidence, and make credibility determinations, tasks that are not ours to do. In his reply brief, Mead contends that so long as he can provide an alternative explanation using the facts found or admitted, he has proven that a reasonable person could not find him guilty beyond a reasonable doubt. That's simply not the standard. When reviewing the evidence for sufficiency determinations, this court must view the evidence in the light most favorable to the State without reweighing the evidence, resolving evidentiary conflicts, or making credibility determinations. Under that standard, sufficient evidence supports his conviction for battery.

Mead also argues there is insufficient evidence to convict him of disorderly conduct because the State failed to establish that Mead had used fighting words. Here, his argument turns mainly on the specific charge made by the State; it was for a form of disorderly conduct that's based not on so-called fighting words but instead on noisy conduct that would reasonably cause alarm, anger, or resentment, not on the words he used.

Under K.S.A. 2016 Supp. 21-6203, disorderly conduct is when a person commits one or more of the listed acts that "the person knows or should know will alarm, anger or disturb others or provoke an assault or other breach of the peace." The listed acts are: (1) brawling or fighting; (2) disturbing a lawful assembly, meeting, or procession; or (3) "using fighting words *or* engaging in noisy conduct tending reasonably to arouse alarm, anger or resentment in others." (Emphasis added.) K.S.A. 2016 Supp. 21-6203(a)(1)-(3). Subsection (3) offers two paths for the State to prove an act sufficient to support a disorderly-conduct charge—fighting words *or* noisy conduct that would reasonably arouse alarm, anger, or resentment in others. The State chose the second option in Mead's case, so we must look to see whether the evidence was sufficient to convict under that option.

10

White, Gitchel, and Vawter all testified that Mead was shouting and screaming as he came toward them. White characterized Mead's behavior as belligerent and threatening. Vawter testified that he viewed Mead coming at them while yelling with his arms in the air as an "aggressive act." This evidence supports the district court's conclusion that Mead engaged in noisy conduct that reasonably caused alarm and anger. Likewise, Mead knew or should have known that yelling and screaming while coming at people would reasonably alarm, anger, or disturb others. Sufficient evidence supported his conviction for disorderly conduct as well.

Mead also claims that because his actions were in self-defense and in defense of his golf cart to stop it from being damaged, he couldn't be convicted of battery or disorderly conduct. Mead apparently is trying to invoke immunity from prosecution under a specific statute, K.S.A. 2016 Supp. 21-5231. Under that statute, a person who used force in self-defense or in defense of property is immune from prosecution unless the State can establish probable cause that the defendant's use of force was not justified. See *State v. Hardy*, 305 Kan. 1001, Syl. ¶ 1, 390 P.3d 30 (2017). But a defendant must invoke immunity under K.S.A. 2016 Supp. 21-5231 before the trial begins and cannot raise the issue for the first time on appeal. *State v. Jones*, 298 Kan. 324, 334, 311 P.3d 1125 (2013); *State v. Gaines*, No. 111,708, 2015 WL 1514075, at *4 (Kan. App. 2015) (unpublished opinion). Mead did not raise this issue before the trial court; we therefore will not consider it on appeal.

II.  *We Cannot Consider Mead's Argument Based on His Constitutional Right to Confront Witnesses Because He Didn't Object to Admission of the Evidence on This Basis at Trial*.

When White and Gitchel testified at trial, they made reference to some statements another man, Bill Cooper, had made. But Cooper didn't testify at trial. On appeal, Mead claims that letting White and Gitchel testify about statements made by Cooper violated Mead's right to confront and cross-examine witnesses at a criminal trial as provided by

11

the Sixth Amendment to the United States Constitution. The State responds that because Mead did not object to the admission of the evidence on those grounds before the district court, he can't raise the argument on appeal. Alternatively, the State argues that any error in admitting the evidence was harmless and did not affect the outcome of the trial.

Here, Mead objected generally to the admission of White's and Gitchel's written statements as hearsay but never objected on the basis he now asserts—that he didn't have a chance to confront Cooper in person and in court. He also did not object when White and Vawter testified about what Cooper had said. Because Mead failed to make a timely objection on confrontation grounds before the district court, he failed to preserve the issue for appeal. See, e.g., *State v. Logsdon*, 304 Kan. 3, 28, 371 P.3d 836 (2016); *State v. Dean*, 298 Kan. 1023, 1035-36, 324 P.3d 1023 (2014) (specifically noting that an objection on hearsay grounds does not equate to an objection on confrontation grounds and holding that the failure to object on confrontation grounds precluded appellate review).

A Kansas statute, K.S.A. 60-404, provides that a defendant must make a timely and specific objection to the admission of evidence at trial to preserve the issue for appeal. See *Logsdon*, 304 Kan. at 28; *State v. Breedlove*, 295 Kan. 481, 490, 286 P.3d 1123 (2012). This means that a defendant must object to offered evidence on the grounds that it violates the Confrontation Clause at trial to preserve the issue for appeal. See *Dean*, 298 Kan. at 1035-36; *State v. Dukes*, 290 Kan. 485, 488-89, 231 P.3d 558 (2010). Additionally, the defendant cannot object to the admission of evidence on one ground at trial and then argue another ground on appeal. *Breedlove*, 295 Kan. at 490; *State v. Richmond*, 289 Kan. 419, 428-29, 212 P.3d 165 (2009).

Mead recognized this potential hurdle and argued in his brief that we should consider the issue for the first time on appeal because it impacts his fundamental rights. As a general rule, an issue not raised before the district court cannot be raised for the first

time on appeal, but an appellate court may consider the issue to prevent a denial of fundamental rights. *State v. Rizo*, 304 Kan. 974, 978-79, 377 P.3d 419 (2016). But Kansas courts have "consistently refused to 'review an evidentiary issue without a timely and specific objection even if the issue involves a fundamental right,'" including the right to confront witnesses. *Logsdon*, 304 Kan. at 28 (quoting *Dukes*, 290 Kan. at 488-89); see *State v. Williams*, 299 Kan. 509, 549-50, 324 P.3d 1078 (2014), *overruled on other grounds by State v. Dunn*, 304 Kan. 773, 375 P.3d 332 (2016); *Dean*, 298 Kan. at 1035-36; *State v. McCaslin*, 291 Kan. 697, 706-09, 245 P.3d 1030 (2011), *overruled on other grounds by State v. Astorga*, 299 Kan. 395, 402, 324 P.3d 1046 (2014). The Kansas Supreme Court "has explained that appellants asserting Confrontation Clause challenges may not circumvent K.S.A. 60-404, otherwise the exceptions would devour the statutory rule." *In re Care & Treatment of Thomas*, 301 Kan. 841, 845, 348 P.3d 576 (2015).

Given the clear, consistent Kansas Supreme Court precedent on this point we will not consider Mead's Confrontation Clause challenge since he did not raise the issue in the district court.

III. *Mead's Convictions for Battery and Disorderly Conduct Do Not Violate the Multiplicity Rule.*

Mead's next argument presents a technical legal argument—but one that raises an important issue as well. If the government splits what is really just a single criminal offense up so that the defendant is charged with two (or more) crimes instead of one, that violates a rule against multiplicity. Simply put, multiplicity is the charging of a single offense in more than one count. *State v. Overman*, 301 Kan. 704, 713, 348 P.3d 516 (2015). The legal problem with multiplicity is that the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution and Section 10 of the Kansas Constitution Bill of Rights prohibit multiple punishments for a single offense. *State v. Pribble*, 304 Kan. 824, 826, 375 P.3d 966 (2016).

13

Mead argues that his convictions for battery and disorderly conduct are multiplicitous because the same conduct—his verbal comments—was used to prove he was guilty of each crime. The State contends that the convictions were not multiplicitous because the crimes of battery and disorderly conduct do not have the same statutory elements.

The Kansas Supreme Court set out the analytical framework to be used in deciding multiplicity issues in *State v. Schoonover*, 281 Kan. 453, 133 P.3d 48 (2006); that remains the test today. See, e.g., *Pribble*, 304 Kan. at 827 (applying *Schoonover*). First, the court asks whether the multiple charges arise from the same conduct, considering several factors including: "(1) whether the acts occur at or near the same time; (2) whether the acts occur at the same location; (3) whether there is a causal relationship between the acts, in particular whether there was an intervening event; and (4) whether there is a fresh impulse motivating some of the conduct." *Schoonover*, 281 Kan. at 497. If the acts arise from the same conduct, the court then asks if, by statutory definition, there are two offenses or only one. 281 Kan. at 497. For cases like this one, with multiple convictions under different statutes, the court uses a same-elements test. 281 Kan. at 497. In the same-elements test, the court compares the elements of each statute and asks whether one statute requires proof of an element not necessary to prove the other offense. 281 Kan. at 498. "If so, the statutes do not define the same conduct and there is not a double jeopardy violation." 281 Kan. at 498. Whether convictions violate the multiplicity rule is a question of law, which we review independently. *Belt*, 305 Kan. at 407.

Mead's multiplicity argument fails because disorderly conduct and battery do not have the same statutory elements. To convict Mead for battery under K.S.A. 2016 Supp. 21-5413(a)(2) as charged, the State had to prove he (1) knowingly caused physical contact with White and (2) did so in a rude, insulting, or angry manner. To convict Mead for disorderly conduct, the State had to prove that Mead had engaged in noisy conduct that would reasonably tend to arouse alarm, anger, or resentment in others and that Mead

14

knew or should have known that his conduct would cause alarm, anger, or disturb others or would provoke an assault or other breach of the peace. See K.S.A. 2016 Supp. 21-6203(a)(3). Battery requires establishing physical contact with another person; disorderly conduct does not. Likewise, none of the elements in disorderly conduct are required to prove battery. Because the statutes defining each offense require proof of elements not necessary to prove the other offense, convictions for disorderly conduct and battery are not multiplicitous. See *State v. Fife*, No. 102,488, 2011 WL 6413616, at *10 (Kan. App. 2011) (unpublished opinion) (concluding that disorderly conduct is not a lesser included offense of aggravated battery because it has elements not present in the aggravated-battery statute).

Mead's argument on appeal doesn't focus on the elements test. Instead, he argues that because the same conduct—his verbal comments—was used to prove battery and disorderly conduct, his convictions are multiplicitous. But his argument is based on a test for multiplicity that is no longer used.

It's true that, for a period of time, some Kansas cases held that convictions were multiplicitous if the same evidence or violent act was used to prove the convictions arising under different statutes. See, e.g., *Schoonover*, 281 Kan. at 481-87, 492-93 (tracing the history of multiplicity and double-jeopardy cases in Kansas). In support of his argument, Mead cites two cases from 1995 or before, *State v. Rinck*, 256 Kan. 848, 850, 888 P.2d 845 (1995), and *State v. Warren*, 252 Kan. 169, 180-82, 843 P.2d 224 (1992). These cases followed and applied an action-based test for multiplicity. But the Kansas Supreme Court in the 2006 case of *Schoonover* set out the current analytical framework for multiplicity issues and held that no other test for multiplicity was valid or applicable. 281 Kan. at 493-95. Under the same-elements test in *Schoonover*, Mead's convictions are not multiplicitous.

15

*IV. We Decline to Address Mead's Argument That the State Failed to Disclose Evidence Helpful to Him Because It Wasn't Raised in the District Court and the Record Is Not Sufficient to Address It.*

Mead contends that the State failed to disclose evidence that might have been helpful to him in violation of its obligation under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). Specifically, he alleges that the State didn't provide the defense with Trainor's complete statement to police and didn't provide Vawter's statement to police until the day of trial. The State responds that the issue wasn't raised before the district court and that there is no evidence that the State withheld evidence favorable to the defense.

The State's first point—that we should not consider the issue since it wasn't raised in the district court—is well taken in this circumstance. First, as a general rule, a party may not raise a constitutional claim, like violation of the *Brady* rule, for the first time on appeal. See *State v. Godfrey*, 301 Kan. 1041, 1043, 350 P.3d 1068 (2015); *State v. Anderson*, No. 114,447, 2016 WL 3961436, at *3 (Kan. App. 2016) (unpublished opinion). Mead has not explained in his appellate brief why we should consider this issue even though he did not raise it in the district court. See Supreme Court Rule 6.02(a)(5) (2017 Kan. S. Ct. R. 34); *Godfrey*, 301 Kan. at 1043-44. Second, even if we were to consider whether to take up this issue so as to avoid potential denial to Mead of an important right, we may decline to do that if the record before us is insufficient to address the merits of the issue. See *State v. Ortega-Cadelan*, 287 Kan. 157, 160, 194 P.3d 1195 (2008). That's true here too.

To understand why our record isn't sufficient to consider the *Brady* issue, we must consider what *Brady* requires. In *Brady*, the United States Supreme Court held that the State has a duty to disclose evidence favorable to the defendant when "the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. Failure to do so violates a defendant's right to due process.

16

*Smith v. Cain*, 565 U.S. 73, 75, 132 S. Ct. 627, 181 L. Ed. 2d 571 (2012) (citing *Brady*, 373 U.S. at 87); *State v. Soto*, 301 Kan. 969, 978, 349 P.3d 1256 (2015). Our Supreme Court has said there are three essential elements to establish a *Brady* violation: (1) that the evidence at issue was favorable to the defendant, either because it was exculpatory or impeaching; (2) that the State suppressed the evidence, either willfully or inadvertently; and (3) that the evidence was material so as to establish prejudice. *State v. DeWeese*, 305 Kan. 699, 710, 387 P.3d 809 (2017) (quoting *State v. Moore*, 302 Kan. 685, 700, 357 P.3d 275 [2015]). For *Brady* purposes, evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *State v. Warrior*, 294 Kan. 484, Syl. ¶ 11, 277 P.3d 1111 (2012).

Mead makes two claims about information that wasn't provided to him. First, Trainor testified that the written statement he gave to police was longer than the one he was handed while on the witness stand. Second, Vawter's written statement to the police wasn't provided to Mead until the day of trial; the prosecutor said police had initially failed to provide that statement to the prosecutor.

In both situations, since the claims weren't raised in the district court, there's key information we don't know. On Trainor's statement, we don't know what was in the missing part. Was it important? Did it support Mead's case? We have no way to know. Similarly, on Vawter's statement, it has not been included in the record on appeal; we therefore have no way to fairly evaluate its significance. Mead's attorney did have the chance to cross-examine Vawter at trial. We can't tell from our record whether there were any areas not effectively explored in cross-examination that might have been more effectively addressed had the statement been produced sooner. And we are not able to tell whether either alleged *Brady* failure caused actual prejudice to Mead.

Even after the initial, direct appeal (like the one now before us), a defendant can still challenge the effectiveness of his or her attorney or the failure of the State to comply with *Brady* requirements in a habeas corpus action under K.S.A. 2016 Supp. 60-1507. See, e.g., *Wilkins v. State*, 286 Kan. 971, 190 P.3d 957 (2008); *Ludlow v. State*, 37 Kan. App. 2d 676, 157 P.3d 631 (2007). Thus, if the State did violate *Brady* here and that violation truly prejudiced Mead, a mechanism to raise the issue remains in place. We therefore decline to consider the issue in this direct appeal, given that the issue was not raised in the district court, the district court has made no factual findings about it, and key documents relevant to the claim are not in the record on appeal.

## V. *Mead Failed to Preserve His Argument that the Admission of Evidence Suggesting Drug Use by Him Violated K.S.A. 2016 Supp. 60-455.*

Mead's next argument is that the district court improperly admitted evidence that he had committed another crime—here, the possession of marijuana. An evidentiary statute, K.S.A. 2016 Supp. 60-455, generally prevents evidence that a defendant has committed a crime not charged in the case unless it's otherwise relevant to some issue like the defendant's motive. The State responds that Mead failed to preserve this issue for appeal and that, even if the evidence was improperly admitted, the error was harmless.

At trial, White reported that he had first come into contact with Mead the night before the altercation. And in White's written statement to police, White alleged that he saw Mead smoking a marijuana cigarette with others when he responded to the scene. Mead objected to the admission of the written statement based on hearsay but did not otherwise object. On direct examination, the State did not ask White about the allegation of marijuana use. On cross-examination, however, Mead's attorney asked White several questions about the allegation and asked White to confirm that he thought it was a marijuana cigarette. Mead's attorney also called a witness who testified that Mead was

18

not smoking a marijuana cigarette that night, although other people nearby were. Mead testified that he had not been drinking or smoking marijuana that night.

On appeal, Mead argues that the district court erred in admitting the evidence of the prior incident regarding possible drug use. Under K.S.A. 2016 Supp. 60-455(a), evidence that a person committed a crime on a specified occasion is inadmissible to prove that the person had a disposition to commit crimes or as the basis to infer that the person committed a crime on another specified occasion. But the evidence can be used when it's relevant to prove some other material fact, such as motive, opportunity, intent, knowledge, identity or absence of mistake. K.S.A. 2016 Supp. 60-455(b).

The problem with Mead's argument is that Mead never objected at trial on the grounds that the evidence violated K.S.A. 2016 Supp. 60-455. Accordingly, since we don't normally address issues for the first time on appeal, the issue is not properly before this court. Another evidentiary statute, K.S.A. 60-404, requires that a defendant make a timely and specific objection to the admission of evidence at trial to preserve the issue for appeal. See, e.g., *State v. Solis*, 305 Kan. 55, 61, 378 P.3d 532 (2016); *State v. Holman*, 295 Kan. 116, 126, 284 P.3d 251 (2012), *overruled on other grounds by State v. Dunn*, 304 Kan. 773, 375 P.3d 332 (2016); *State v. Gaona*, 293 Kan. 930, 956, 270 P.3d 1165 (2012) (contemporaneous-objection rule applies to evidence alleged to be admitted in violation of K.S.A. 60-455). Failure to object generally precludes appellate review, though an appellate court's refusal to consider an unpreserved issue is a matter of prudence, not jurisdiction. See *Solis*, 305 Kan. at 64; *State v. Hart*, 297 Kan. 494, 510-11, 301 P.3d 1279 (2013); *Gaona*, 293 Kan. at 956; *State v. Johnson*, No. 109,974, 2014 WL 2225984, at *4 (Kan. App. 2014) (unpublished opinion). Given Mead's failure to object on the basis of K.S.A. 2016 Supp. 60-455 at trial, which deprived the district court of the opportunity to address the issue and take any required steps to avoid prejudice to Mead, we decline to take this issue up on its merits in this appeal.

*VI.  Mead's Argument That Some Rebuttal Testimony Shouldn't Have Been Allowed Is Not Properly Before Us Since He Didn't Raise This Objection at Trial.*

Mead next complains that the admission of some rebuttal testimony violated his due-process rights. Mead takes issue with the State calling Captain Welch as a rebuttal witness and putting on evidence about a beer bottle and a jar of green, leafy vegetation. At trial, Mead's attorney did raise an objection to the testimony about the beer bottle and jar of vegetation; the attorney argued that the evidence shouldn't be admitted because the information had not previously been turned over to the defense and had unfairly surprised the defense. The court responded that the State was offering the evidence to rebut evidence presented in the defense's case-in-chief and allowed the State to continue its line of questioning.

The significant point on appeal is that  Mead did not object on the grounds that appear to underlie his appellate argument—that the rebuttal evidence was outside the scope of permissible rebuttal evidence or that it violated K.S.A. 2016 Supp. 60-455. Ordinarily, "'[a] defendant may not object to the admission of evidence on one ground at trial and then assert a different ground for objection on appeal.'" *State v. Page*, 303 Kan. 548, 558, 363 P.3d 391 (2015) (quoting *State v. Huffmier*, 297 Kan. 306, 319, 301 P.3d 669 [2013]).  Additionally, we note that the district court has broad discretion in determining the use and extent of relevant evidence in rebuttal. *State v. Kleypas*, 305 Kan. 224, 340, 382 P.3d 373 (2016). Thus, it's especially important that the defendant raise the specific objection so that the trial court can appropriately exercise its discretion. Given the broad discretion given to the trial court over rebuttal evidence and the defendant's failure to raise the issue he now pursues on appeal during trial, we decline to address his claim of error in the scope of the State's rebuttal evidence.

20

*VII. We Cannot Consider Mead's Claim of an Unreasonable Search.*

Mead's next argument goes to the beer bottle and jar of green, leafy vegetation found in the golf cart. He contends that the search of the golf cart violated his Fourth Amendment right to be free from unreasonable searches and seizures.

Once again, though, Mead is raising an issue he did not bring up at trial. The only objection made at trial was that the defense did not know about the beer bottle or jar of vegetation and was unfairly surprised. Mead did not claim at trial that the evidence should have been suppressed because it was the product of an unlawful search. So Mead again runs up against the rules that a party must object to the admission of evidence at trial to preserve an issue for appeal and cannot raise an objection on other grounds on appeal. See K.S.A. 60-404; *Page*, 303 Kan. at 558. Additionally, we may generally decline to consider an issue, even a constitutional one, raised for the first time on appeal. *Godfrey*, 301 Kan. at 1043; *State v. Plummer*, 295 Kan. 156, 161, 283 P.3d 202 (2012).

The normal practice in the trial court is to use a pretrial motion to suppress evidence to raise a Fourth Amendment issue. The trial court would then hold an evidentiary hearing, determine the facts, and decide based on those facts whether the search was unreasonable such that the evidence should be excluded. Even when the defense claims surprise from evidence produced immediately before trial, the defense still should raise the issue so that the trial court can determine any facts relevant to the claim of unreasonable search or seizure. Here, since Mead did not raise the issue before the district court, the district court did not make any factual findings that would shed light on whether the search was unreasonable or conducted without proper legal justification. Accordingly, making any fair legal conclusion on appeal regarding the search would be impossible. Because Mead failed to raise this issue before the district court, we cannot reasonably consider it for the first time on appeal.

*VIII.  This Court Should Not Consider Mead's Claim of Ineffective Assistance of Counsel Raised for the First Time on Appeal.*

Mead raises one final issue—a claim that his lawyer at trial didn't provide adequate representation, thus leaving him without the effective assistance of counsel guaranteed under the Sixth and Fourteenth Amendments to the United States Constitution. The State again points out that this is an issue Mead didn't raise in the district court.

As a general rule, an appellate court will not address the merits of an ineffective-assistance-of-counsel claim for the first time on direct appeal. *State v. Dull*, 298 Kan. 832, 839, 317 P.3d 104 (2014). This is because there has been no opportunity for the parties to develop the facts and present evidence regarding the trial lawyer's representation or to have the district court judge who presided over the proceedings (and is likely in the best position to assess the merits) to consider and rule on the claims. *Rowland v. State*, 289 Kan. 1076, 1084, 219 P.3d 1212 (2009). Often, the district court must consider conflicting testimony and evidence regarding the lawyer's actions or inactions, the significance of those actions or inactions, and the strength or weakness of a particular argument. *State v. Levy*, 292 Kan. 379, 389, 253 P.3d 341 (2011).

When a defendant raises an ineffective-assistance claim for the first time on direct appeal, we have the option to handle the claim in one of three ways. *State v. Reed*, 302 Kan. 227, 233-34, 352 P.3d 530, *cert. denied* 136 S. Ct. 344 (2015). First, we may follow the general rule and decline to address the claim. 302 Kan. at 233-34. The defendant may then raise the claim before the district court in a timely habeas corpus action under K.S.A. 60-1507. Second, the appellate court may remand the case to the district court to hold a special hearing on the claim. 302 Kan. at 234. To warrant a special hearing, however, an appellant (usually through his or her new counsel) must conduct some investigation into the claim and attempt to determine the circumstances under which the

trial lawyer acted; it's not enough merely to read the record and argue that the case should have been handled differently. *Levy*, 292 Kan. at 389 (citing *State v. Van Cleave*, 239 Kan. 117, 119-21, 716 P.2d 580 [1986]). Third, in extremely rare circumstances, the appellate court will consider the merits on direct appeal because the appellate record is sufficient to decide the claims; in such cases, the merit or lack of merit of the ineffectiveness claim must be obvious. *Reed*, 302 Kan. at 234 (citing *Dull*, 298 Kan. at 839).

Because Mead is representing himself without the help of a lawyer, it's understandable why he would raise his ineffective-assistance claim on direct appeal—many issues have to be raised on direct appeal or they are deemed waived. Ineffective-assistance claims are unusual in that regard. Mead's case is not one of the rare ones in which this court can decide his ineffective-assistance claim without the district court first considering the claim and developing the record. Some of Mead's grievances with his attorney's performance may have been the product of reasonable trial strategy. See *Shumway v. State*, 48 Kan. App. 2d 490, 497, 293 P.3d 772 (2013). Likewise, Mead has not meet the requirements to warrant remanding the issue to the district court for a special hearing. See *Levy*, 292 Kan. at 389. We therefore follow the general rule and decline to address Mead's ineffective-assistance claim in this direct appeal.

The district court's judgment is affirmed.

23