NOT DESIGNATED FOR PUBLICATION

No. 125,743

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

COBY LANDON CUPP,
*Appellant.*

MEMORANDUM OPINION

Appeal from Crawford County District Court; LORI BOLTON FLEMING, judge. Oral argument held September 19, 2023. Opinion filed November 22, 2023. Affirmed.

*Amy M. Ross* and *Robert E. Myers*, of Columbus, for appellant.

*Steven J. Obermeier*, assistant solicitor general, and *Kris W. Kobach*, attorney general, for appellee.

Before COBLE, P.J., MALONE and WARNER, JJ.

PER CURIAM: After a late-night single vehicle accident, the State charged Coby Landon Cupp with alternative crimes: one count of driving under the influence (DUI), second offense, with a blood alcohol content (BAC) of 0.08 or higher; and an alternative count of DUI, second offense, incapable of safely operating a vehicle. After the jury found him guilty of both offenses, the district court convicted him only on Count 1. Cupp appeals his conviction, raising evidentiary challenges, challenges to the jury verdict form, and a sufficiency of the evidence issue. After review, we affirm his conviction. Exigent circumstances existed to justify the warrantless draw of Cupp's blood, and the admission

1

of one deputy's testimony regarding the temperature of Cupp's truck engine block was harmless even if it may have been erroneous. Furthermore, the district court entered only one conviction despite the jury's findings on both alternative counts; and sufficient evidence supported Cupp's DUI conviction and validated the denial of his motion for acquittal at the close of trial.

FACTUAL AND PROCEDURAL BACKGROUND

Testimony at Cupp's trial outlined the events which underlie his conviction. At 12:44 a.m. on September 29, 2019, Deputy Tim Milburn of the Crawford County Sheriff's Office responded to a one-vehicle accident. When Deputy Milburn located the reported accident, he saw a red GMC Sierra pickup truck against the tree line in the east ditch. It appeared the truck had gone off the road and struck a tree, as the truck's front end was smashed.

Deputy Milburn made his way off the roadway to the truck, opened the passenger's side door, and found a man lying in the passenger seat with his feet on the driver's side floorboard. Specifically, the vehicle's occupant was facing toward the dash with his upper legs toward the driver's side floorboard, feet under the steering wheel but his torso slumped over with his head toward the passenger's side. The man was nonresponsive to the deputy's questions; to Deputy Milburn, he appeared to be unconscious upon first contact.

The deputy then retrieved a wallet from the man's pocket, determined him to be Cupp, and noticed Cupp had bleeding from his face. Cupp's glasses were up in the dash area closer to the passenger's side, and in the dust, the deputy saw a smudge on the dash to the right of the stereo system. Based on these observations, Deputy Milburn deduced it was possible that Cupp had hit his face on the dash. The deputy continued to assess whether Cupp was awake, but Cupp remained nonresponsive to questions. So, Deputy

2

Milburn leaned down to determine if Cupp was still breathing. When he did so, he determined Cupp was still breathing and at the same time could smell the odor commonly associated with alcohol coming from Cupp's breath. Deputy Milburn described Cupp's breathing as "snoring type breathing." Deputy Nathan Swartz, who was also dispatched to the scene and arrived after Deputy Milburn, described Cupp as "not alert at all. He was breathing, making noise, moving but there was no communication whatsoever. No response for questioning or saying anything to him. It was just noise, gargling actually."

While assessing the scene, Deputy Swartz witnessed an open can of beer on the floorboard in a koozie, which was still cold with condensation on the beer can.

Based on the odor of alcohol, the open container, and the circumstances of the accident, Deputy Milburn believed Cupp might be intoxicated. Deputy Milburn called for the paramedics and, while waiting for them to arrive, prepared supplies for a blood draw because he figured he would likely be drawing Cupp's blood due to his facial injuries and his need for medical treatment, which may have included helicopter transport. A life flight helicopter had been requested due to Cupp's injuries, but the helicopter declined making the flight because of the weather. Further details of the exact weather conditions were neither evident in the record nor discussed at trial.

The paramedics arrived, assessed Cupp, moved him from the truck to the ambulance, and started treating him. Once Cupp was moved into the ambulance, Deputy Milburn read Cupp the Implied Consent Advisory Form, the DC-70, and asked Cupp if he consented to the blood draw. Cupp was nonresponsive to this question. Deputy Milburn requested a paramedic perform the blood draw. Jacob Ward, a paramedic with the Crawford County EMS, drew the blood sample.

This blood sample was sent to the Kansas Bureau of Investigation (KBI) for testing. According to the KBI report, the level of ethyl alcohol in Cupp's blood sample

3

was 0.29 grams per 100 milliliters of blood. Similarly, a forensic toxicologist testified at trial that the blood sample was positive for ethyl alcohol at a concentration of 0.29 grams per 100 milliliters of blood.

Deputy Swartz noticed the truck was inoperable with significant damage to the front end. The front passenger's side of the hood was bunched up, and Deputy Swartz put his hand in to feel the engine block area. He felt that the engine block was "a little bit warm." The deputy testified feeling the engine block to assess its temperature was something that he routinely did as a deputy because it was a good indication of whether the vehicle had been there for a while or not. Based on his feeling of the engine block and his prior experiences, Deputy Swartz testified that the truck had "been driven within a few hours probably."

Prior to the deputy offering his conclusion on when the vehicle had last been operated, Cupp's attorney objected to the testimony arguing, "I think it calls for speculation. He can testify to his observations but I think asking him for a conclusion is outside of the scope." The State countered that the "question is based upon the witness['] own experiences which he has laid foundation for." The district court allowed Deputy Swartz to "testify based upon [his] prior experiences and the facts of this case."

At trial, Cupp testified in his own defense. He denied operating the truck. He testified that day he walked from his house to a restaurant for lunch, where he met a man who introduced himself as Nate. According to Cupp, Nate offered to give him a ride home to his residence, and they went there in Nate's vehicle. The pair socialized on Cupp's porch, and at some point, they decided to go to the local casino. However, Nate's vehicle was low on gas, so they took Cupp's son's truck (the vehicle that was ultimately crashed). Before leaving his home, Cupp grabbed a beer "to go" because he did not want to pay the prices charged for a beer at the casino.

Cupp testified that he was not driving the truck, rather Nate was driving. Cupp was not wearing his seatbelt. He recalled that while Nate was driving, the truck went airborne and hit two trees, one on each side of the truck, and the collision "almost shoved the motor in [their] laps." He did not know what caused the truck to leave the road because he was looking down at his phone just before the truck left the roadway. According to Cupp, Nate offered to help Cupp walk home, but Cupp could not walk because he "was too injured." So, Nate left Cupp in the truck, and Cupp called 911. He recalled his injuries at trial:

> "I didn't know at the time how bad it was, but I knew I couldn't walk but I still don't talk right. I fractured my larynx, deflated my lung which I didn't know at the time, broke my collarbone, broke my ribs. I cracked the moon roof with my head which gave me a concussion so it wasn't fun."

Cupp testified he tried to get out of the passenger's side but could not open the door. He said he was able to get out of the driver's side "and that's when [he] encountered the officers." He stated he was waiting for the ambulance and spoke with Deputy Milburn but could not recall anything of their conversation. Cupp testified that he remembered being in a great deal of pain, so he went back to the truck to lay in the seat until the ambulance arrived. He testified that he smelled so much of alcohol because when the truck made impact with the trees, his beer spilled everywhere.

Cupp did not call Nate as a witness. Deputy Milburn testified during rebuttal there was no one at the scene named Nate except Deputy Swartz, and it did not appear there had been anyone outside of the truck prior to when he arrived on the scene. The deputy testified, contrary to Cupp, that the first contact he had with Cupp was opening the passenger's side door and seeing him laying unresponsive in the truck. Unfortunately, the jury did not have the benefit of Deputy Milburn's bodycam video footage to reconcile these contradictory versions of events. The deputy was not wearing his bodycam because

5

it was elsewhere downloading evidence. However, Deputy Swartz' bodycam video footage was introduced as evidence at trial.

The State brought alternative charges against Cupp—each a variation of DUI. The complaint alleged that Cupp operated a motor vehicle while sustaining a BAC of at least 0.08 grams, second offense, in violation of K.S.A. 8-1567(a)(1). In the alternative, the State alleged Cupp operated a motor vehicle while under the influence of alcohol to a degree that rendered him incapable of safely driving a vehicle, second offense, in violation of K.S.A. 8-1567(a)(3).

Prior to trial, Cupp filed a motion to suppress the results of the blood draw. In that motion, Cupp argued that Deputy Milburn failed to receive his consent for the blood draw, so the evidence collected from his blood was inadmissible and should be suppressed. After an evidentiary hearing, the district court denied Cupp's motion to suppress. In so doing, the district court held that exigent circumstances existed to permit Cupp's blood draw.

Ultimately, the jury found Cupp guilty of DUI under both alternatives, and the court verified the jury was unanimous on both counts. The district court entered a conviction on Count 1. As a result, in October 2022, after denying a motion for acquittal or a new trial, the district court sentenced Cupp to 12 months' confinement in the county jail, fined him $1,250 for his second conviction of DUI, and placed him on probation for 12 months. However, the district court suspended all except five days of Cupp's jail sentence.

Cupp timely appeals his DUI conviction.

DISCUSSION

On appeal, Cupp contends the district court erred in four ways: (1) denying his motion to suppress the blood draw evidence; (2) permitting Deputy Swartz to testify "in an expert capacity" when the deputy testified the engine block's temperature indicated the truck had likely been driven within a few hours; (3) accepting the jury verdict form with both the original and alternative charges marked as guilty; and (4) denying his motion for judgment of acquittal or, in the alternative, a new trial. We address each argument in turn.

## DID THE DISTRICT COURT ERR BY DENYING CUPP'S MOTION TO SUPPRESS THE EVIDENCE DERIVED FROM HIS BLOOD DRAW?

Cupp first argues the district court erred by denying his motion to suppress the evidence from his blood draw. Cupp argues that no exigent circumstances existed because he was conscious, there were two deputies present at the scene (so one could have left to get a search warrant), and the officers did not provide Cupp an adequate opportunity to refuse the blood test. The State maintains exigent circumstances existed to justify taking the blood sample because Cupp was "unconscious or in a stupor." Deputies and paramedics also thought Cupp may be life-flighted because of his injuries, and paramedics needed to begin treating him, but a blood draw must occur before treatment because the fluids and pain medication could affect the BAC results.

*Applicable Legal Principles*

To preserve review of the denial of a motion to suppress for appeal, the moving party must object to the introduction of that evidence at trial. *State v. Stevens*, 285 Kan. 307, 326, 172 P.3d 570 (2007), *overruled on other grounds by State v. Ahrens*, 296 Kan. 151, 290 P.3d 629 (2012). A clear statement that there is a continuing objection to the evidence disputed in the motion to suppress sufficiently preserves the issue. *State v. Abbott*, 31 Kan. App. 2d 706, 711, 71 P.3d 1173 (2003), *aff'd* 277 Kan. 161, 83 P.3d 794

(2004) (affirming the Court of Appeals without a discussion on preservation). Here, Cupp lodged a continuing objection to the evidence derived from the warrantless blood draw, so the issue is properly preserved for our review.

"When considering a district court's ruling on a motion to suppress evidence, we review the district court's factual findings to determine whether they are supported by substantial competent evidence. We review the ultimate legal conclusions based on those findings de novo. [Citations omitted.]" *State v. Chavez-Majors*, 310 Kan. 1048, 1053, 454 P.3d 600 (2019). In reviewing the factual findings, an appellate court does not reweigh the evidence or assess the credibility of witnesses. *State v. Sesmas*, 311 Kan. 267, 275, 459 P.3d 1265 (2020).

The Fourth Amendment to the United States Constitution, made applicable to the states via the Fourteenth Amendment to the United States Constitution, guarantees people have the right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." See *Mapp v. Ohio*, 367 U.S. 643, 646 n.4, 655, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961). Under the Fourth Amendment, federal and state actors are prohibited from performing unreasonable searches or seizures. 367 U.S. at 655.

The Kansas Constitution Bill of Rights provides the same protection against unreasonable searches and seizures. See *State v. Howard*, 305 Kan. 984, 989, 389 P.3d 1280 (2017) (interpreting section 15 of Kansas Constitution Bill of Rights as offering identical protections as Fourth Amendment). Under section 15:  "The right of people to be secure in their persons and property against unreasonable searches and seizures, shall be inviolate."

A warrantless search or seizure is always unreasonable unless it fits within one of the exceptions to the warrant requirement. *Chavez-Majors*, 310 Kan. at 1053-54. These warrant requirement exceptions include:  "'consent; search incident to a lawful arrest;

8

stop and frisk; probable cause plus exigent circumstances; the emergency doctrine; inventory searches; plain view or feel; and administrative searches of closely regulated businesses.'" *Howard*, 305 Kan. at 989 (quoting *State v. Richard*, 300 Kan. 715, 726-27, 333 P.3d 179 [2014]). If one of these exceptions is not satisfied, any evidence revealed from the warrantless search or seizure is inadmissible and must be suppressed. *Chavez-Majors*, 310 Kan. at 1054. It is the State's burden to show one of the exceptions is satisfied, rendering the warrantless search reasonable. K.S.A. 22-3216(2); *State v. Estrada-Vital*, 302 Kan. 549, 556, 356 P.3d 1058 (2015).

Applicable here, a blood draw constitutes a "search" under the Fourth Amendment. *Missouri v. McNeely*, 569 U.S. 141, 148, 133 S. Ct. 1552, 185 L. Ed. 2d 696 (2013); *Chavez-Majors*, 310 Kan. at 1054. The State argued the warrantless search of Cupp's blood was reasonable under the probable cause plus exigent circumstances exception to the warrant requirement. Kansas courts use a three-prong test to determine whether such a warrantless blood draw fits within the probable cause plus exigent circumstances exception to the warrant requirement: "(1) there must be exigent circumstances which justify the taking of the blood sample; (2) there must be probable cause to believe the defendant had been driving while legally impaired; and (3) the procedure used to extract blood must be reasonable." 310 Kan. at 1054.

*The District Court Did Not Err When Denying the Motion to Suppress the Blood Draw Evidence, Finding Exigent Circumstances Justified the Warrantless Blood Draw*

Prior to Cupp's trial, the district court concluded that the warrantless blood draw was reasonable because it met this three-prong test. Specifically, in its written order after an evidentiary hearing on the motion, the district court held:

> "Here, the State has met its burden of proof. Exigent circumstances existed which justified the taking of blood from defendant in that he was injured in a motor vehicle accident, and it was reasonably believed by the responding officer that a life flight

9

helicopter would quickly transport [Cupp] out of the area prior to being able to obtain a warrant. Moreover, [Cupp] was, at best, minimally responsive. Based on the testimony at hearing and video admitted into evidence, [Cupp] was very clearly unable to consent to his blood being drawn as he was unconscious for most of the interaction with law enforcement. The [bodycam] video admitted demonstrates that [Cupp] was clearly incoherent. He was asked during the reading of the DC-[7]0 whether he would take a blood test, and his response was unintelligible. Law enforcement audibly discussed on the video that they believed a 'chopper' would be coming. There was probable cause to believe [Cupp] was driving while impaired in that there was the odor of alcohol on his person and a half-full can of cold beer in his automobile compartment. The procedure to draw the blood was normal and reasonable as it was properly drawn by a paramedic."

On appeal, Cupp does not challenge the second or third prongs of the exigent circumstances test—probable cause to believe the defendant had been driving while legally impaired or utilization of the proper blood draw procedure. We focus only, then, on the first factor—exigent circumstances which justify the taking of the blood sample— as Cupp has not properly briefed the other two, limiting our consideration of those prongs. See *State v. Meggerson*, 312 Kan. 238, 246, 474 P.3d 761 (2020) (holding points raised incidentally in brief and not argued therein are deemed waived or abandoned).

The United States Supreme Court considered exigent circumstances surrounding a blood draw when a suspected intoxicated driver is unconscious, unresponsive, or in a stupor in *Mitchell v. Wisconsin*, 588 U.S. ___, 139 S. Ct. 2525, 204 L. Ed. 2d 1040 (2019). In that case, law enforcement received a report that Mitchell got into a van while appearing very drunk and drove off. After finding him wandering near a lake, officers gave Mitchell a preliminary breath test which registered triple Wisconsin's legal limit, so the officers arrested Mitchell to transport him to the police station for a more reliable breath test. But Mitchell's condition continued to deteriorate, and by the time the patrol vehicle arrived at the station, he was too lethargic for a breath test. The officer then drove Mitchell to a nearby hospital for a blood test. On the way to the hospital, Mitchell lost

consciousness. Although the officer still read Mitchell the standard statement giving drivers the opportunity to refuse BAC testing, he did not respond. The officer had hospital staff draw a blood sample, and Mitchell moved to suppress the results of the blood test at trial.

The United States Supreme Court held "when a driver is unconscious, the general rule is that a warrant is not needed." 139 S. Ct. at 2531. It rationalized this holding:

"When a breath test is impossible, enforcement of the drunk-driving laws depends upon the administration of a blood test. And when a police officer encounters an unconscious driver, it is very likely that the driver would be taken to an emergency room and that his blood would be drawn for diagnostic purposes even if the police were not seeking BAC information. In addition, police officers most frequently come upon unconscious drivers when they report to the scene of an accident, and under those circumstances, the officers' many responsibilities—such as attending to other injured drivers or passengers and preventing further accidents—may be incompatible with the procedures that would be required to obtain a warrant." 139 S. Ct. at 2531.

Further elaborating, the *Mitchell* Court noted:

"Indeed, unconsciousness does not just create pressing needs; it is *itself* a medical emergency. It means that the suspect will have to be rushed to the hospital or similar facility not just for the blood test itself but for urgent medical care. Police can reasonably anticipate that such a driver might require monitoring, positioning, and support on the way to the hospital; that his blood may be drawn anyway, for diagnostic purposes, immediately on arrival; and that immediate medical treatment could delay (or otherwise distort the results of) a blood draw conducted later, upon receipt of a warrant, thus reducing its evidentiary value." 139 S. Ct. at 2537-38.

Finally, it concluded:

> "When police have probable cause to believe a person has committed a drunk-driving offense and the driver's unconsciousness or stupor requires him to be taken to the hospital or similar facility before police have a reasonable opportunity to administer a standard evidentiary breath test, they may almost always order a warrantless blood test to measure the driver's BAC without offending the Fourth Amendment." 139 S. Ct. at 2539.

Applying similar logic, we conclude that substantial competent evidence supports the district court's conclusion that exigent circumstances existed to render Cupp's warrantless blood draw reasonable.

First, a review of Deputy Swartz' bodycam video footage supports the officers' trial testimony, showing Cupp was incoherent and unresponsive, and at times appears to be unconscious. Deputy Milburn asked Cupp if he would submit to a blood test, but Cupp does not appear to answer because of his stupor and/or his injuries. In the bodycam video, Cupp's face is in view while he is on the gurney in the ambulance; his eyes remain closed and he makes no movement when the deputy, after reading the DC-70, asks, "Would you be willing to take a blood draw?" And, at the time of the blood draw, the emergency personnel responding to the accident believed that Cupp was going to be transported via life flight helicopter. In fact, a helicopter was put on standby, although ultimately Cupp was transported via ambulance.

Cupp's injuries were significant—a fractured larynx, a deflated lung, a broken collarbone and ribs, and a concussion—and the medical treatment Cupp emergently needed would affect Cupp's BAC. And again—bodycam video evidence shows Cupp was, at best, in a stupor or incoherent or, at worst, unconscious. Such a state rendered a warrantless blood draw reasonable. See *Mitchell*, 139 S. Ct. at 2539 (holding "[w]hen police have probable cause to believe a person has committed a drunk-driving offense and the driver's unconsciousness or stupor requires him to be taken to the hospital or

12

similar facility before police have a reasonable opportunity to administer a standard evidentiary breath test, they may almost always order a warrantless blood test to measure the driver's BAC without offending the Fourth Amendment").

Cupp argues that one of the two responding deputies could have left the scene to request a warrant. However, this was simply not reasonable. The truck can be seen partially blocking the roadway in an unlit area. Had one deputy left the scene to obtain a warrant, the only other deputy on duty that evening would have been left alone at the scene to manage multiple emergent concerns simultaneously: directing any potential vehicles that came upon the accident, the paramedics, and Cupp, who was severely injured. Deputy Milburn testified that on the date of the accident in 2019, applying for a warrant at that hour in the morning—around 1 a.m.—would have required him to drive back to the sheriff's office (which was approximately 20 to 30 minutes from the scene of the accident), draft a warrant, call the on-call judge, wait for the judge's response, fax or email the form to the judge, and then wait for the judge to return the signed warrant to the deputy. All while Cupp would either not be receiving medical care—in the hopes of preserving evidence—or would be receiving the medical care he was rightfully due and needed—while the treatment compromised any BAC evidence. Such a situation is untenable.

The circumstances presented by Cupp's accident were even more exigent than those presented in *Mitchell*, where the United States Supreme Court held exigent circumstances existed to cloak the warrantless blood draw in reasonability. See 139 S. Ct. at 2537-38. There, Mitchell had no injuries and only became unconscious while being transported from the scene to the station for a more reliable BAC test. Here, Cupp had significant injuries and appeared unconscious upon first contact with the deputies.

Under these circumstances, we find the district court properly denied Cupp's motion to suppress the evidence derived from the warrantless blood draw because exigent

13

circumstances existed to render the blood draw reasonable given Cupp's medical state, both in terms of his consciousness and his physical emergent injuries.

### Did the District Court Err by Permitting Deputy Swartz' Testimony Regarding the Engine Block's Temperature and the Truck's Likely Time of Last Operation?

Next, Cupp argues that the district court erred when it allowed Deputy Swartz to testify "in an expert capacity" when he stated the engine block's temperature indicated the truck had likely been driven within a few hours.

At trial, the following exchange occurred during Deputy Swartz' testimony:

"[THE STATE:] Did you notice anything in particular about the vehicle?

"[DEPUTY SWARTZ:] It was red, significant damage to the front end. There was an individual laying in the front seat.

"[THE STATE:] At any point do you recall touching the vehicle?

"[DEPUTY SWARTZ:] I did. The front passenger side of the hood area it was bunched up and I just felt inside of the engine block area.

"[THE STATE:] Did you notice anything about the engine block?

"[DEPUTY SWARTZ:] It was a little bit warm.

"[THE STATE:] And now touching engine blocks is that something you do routinely as a deputy?

"[DEPUTY SWARTZ:] Yes. Vehicles that we find on the side of the road or accidents that we come up on or dispatched to it's a good indication of whether it's been there for a while or not.

"[THE STATE:] So based upon your experiences what were you able to conclude when you touched the truck—

"[DEFENSE COUNSEL:] Your Honor, I'm going to object. I think it calls for speculation. He can testify to his observations but I think asking him for a conclusion is outside of the scope.

"THE COURT: Mr. Crux [the State].

14

"[THE STATE:] Your Honor, the question is based upon the witness['] own experiences which he has laid a foundation for.

"THE COURT: I'm going to allow it. You can testify based upon your prior experiences and the facts of this case.

"[THE STATE:] (By Mr. Crux) Do you need me to repeat the question?

"[DEPUTY SWARTZ:] Yeah, repeat the question.

"[THE STATE:] Based on your prior experiences what did touching the engine block in this case indicate to you?

"[DEPUTY SWARTZ:] That it had been driven within a few hours probably."

*Legal Principles Applicable to Admission of Evidence*

"The admission of evidence involves several legal considerations: determining relevance; identifying and applying legal principles including rules of evidence; and weighing prejudice against probative value. [Citation omitted.]" *State v. Levy*, 313 Kan. 232, 237, 485 P.3d 605 (2021). Depending on the type of admissibility challenge, appellate courts apply different standards of review. 313 Kan. at 237-38. See *State v. Shadden*, 290 Kan. 803, 817-18, 235 P.3d 436 (2010). Because Cupp argues the district court violated his statutory right to the exclusion of specific evidence, the statutory harmless error analysis applies. So, even assuming the district court erroneously admitted evidence, the action is subject to review for harmless error under K.S.A. 2022 Supp. 60-261. *State v. Lowery*, 308 Kan. 1183, 1235, 427 P.3d 865 (2018). The statutory standard "disregards errors that do not affect the substantial rights of the parties, to determine if there is a 'reasonable probability that error will or did affect the outcome of the trial in light of the entire record.'" *State v. McCullough*, 293 Kan. 970, 981-82, 270 P.3d 1142 (2012). As the party benefitting from the presumed admissibility error, the State bears the burden of demonstrating the error did not affect the outcome. 293 Kan. at 982-83.

15

*Preservation*

As a threshold matter, the State suggests that Cupp may not have properly preserved this issue for appeal. While Cupp objected at trial to Deputy Swartz' discussion of the engine block's temperature and its implications, he arguably objected to the testimony as speculation. But on appeal, he now contends this evidence should not have been admitted because it was improper expert testimony.

The Kansas Supreme Court has been abundantly clear that a timely and specific objection is necessary to preserve review of the admission of evidence. See *State v. Reed*, 300 Kan. 494, 505-06, 332 P.3d 172 (2014) (discussing K.S.A. 60-404, which provides that evidentiary errors must not be reviewed on appeal unless "'there appears of record objection to the evidence timely interposed and so stated as to make clear the specific ground of objection'"). And K.S.A. 60-404 precludes appellate review when a party objected to the admission of evidence on one ground at trial but then argues a different ground on appeal because doing such "undercut[s] the purpose of contemporaneous objections." *State v. Richmond*, 289 Kan. 419, 429, 212 P.3d 165 (2009); see *State v. Huffmier*, 297 Kan. 306, 319, 301 P.3d 669 (2013) (holding defendant may not object to admission of evidence on one ground at trial and then argue a different ground for objection on appeal).

But we are not convinced the discussion of Cupp's objection at trial was limited to speculation. In fact, although Cupp's trial counsel said the testimony "call[ed] for speculation," he went on to note the officer could only "testify to his observations" but "asking him for a conclusion is outside of the scope"—presumably of his personal observation. This lends itself to a discussion of the officer's personal observation versus his potential use as an expert and suggests the district court weighed Cupp's concerns in that light.

Regardless, we need not reject this evidentiary question on grounds of preservation. Even assuming Cupp's objection was preserved for appellate review, and assuming the district court erred by admitting Deputy Swartz' testimony regarding the engine block's temperature, any error was harmless.

*Even if Admitted in Error, Deputy Swartz' Testimony Was Harmless*

If the evidence of Cupp's guilt was so substantial that there is no reasonable probability that the erroneous admission of Deputy Swartz' testimony could have affected the result of the trial, the erroneous admission is harmless. See *McCullough*, 293 Kan. at 981-82; *State v. Jamison*, 269 Kan. 564, 570, 7 P.3d 1204 (2000). As we analyze in the sufficiency section below, adequate circumstantial evidence supported Cupp's DUI conviction. Cupp was discovered with his feet and lower legs under the steering wheel and lower body lying toward the driver's side of the vehicle. Cupp was unresponsive, if not unconscious; there was an open can of cool beer in the cab of the truck; and his breath smelled of alcohol. Aside from Cupp's own testimony, there was no indication another person had been in or around the truck. Under these circumstances, the deputies believed he was intoxicated, and the blood test confirmed as much.

And, the testimony regarding the warmth of the engine block and how that related to the time frame of when the truck was driven was not necessary to the jury's verdict. Under the first subsection of K.S.A. 8-1567 under which Cupp was charged—(a)(1)—there was no time frame element to be proven, unlike the next subsection of the statute, which would have required the BAC to be measured within three hours of the time of operating or attempting to operate the vehicle. K.S.A. 8-1567(a)(2).

Even though much of the evidence is circumstantial, the combined evidence supports the jury's verdict, even disregarding the testimony on the warmth of the truck's

engine block or recency of its driving. Because there is no reasonable probability that the error affected the outcome of the trial, in light of the record, the admission was harmless.

## DID THE DISTRICT COURT ERR BY ACCEPTING THE JURY VERDICT FORM?

Cupp's third argument relates to the jury verdict form. He contends the district court erred in accepting the jury verdict form with both the original and alternative charges marked as guilty. The State responds there was no error because the district court properly merged the two convictions.

Although jury verdict forms are not jury instructions, appellate courts utilize the same standard of review for both inquiries. See *State v. Hayes*, 57 Kan. App. 2d 895, 909-10, 462 P.3d 1195 (2020). When analyzing jury instruction issues, appellate courts follow a three-step process: (1) determining whether the appellate court can or should review the issue, in other words, whether there is a lack of appellate jurisdiction or a failure to preserve the issue for appeal; (2) considering the merits of the claim to determine whether error occurred below; and (3) assessing whether the error requires reversal, using different standards depending on whether the claim has been preserved. *State v. Martinez*, 317 Kan. 151, 162, 527 P.3d 531 (2023); *State v. Holley*, 313 Kan. 249, 253-54, 485 P.3d 614 (2021). As the appellate court, we review the error and reversibility prongs de novo. *State v. Randle*, 311 Kan. 468, Syl. ¶ 1, 462 P.3d 624 (2020).

Cupp did not object to the jury verdict form or its related instruction. As such, we review for clear error, which requires the instruction to be legally or factually inappropriate and the court to be firmly convinced the jury would have reached a different verdict if the erroneous instruction had not been given. *State v. Crosby*, 312 Kan. 630, 639, 479 P.3d 167 (2021). As the party claiming clear error, Cupp has the burden to show both error and prejudice. 312 Kan. at 639.

18

The State charged Cupp in the alternative with DUI under K.S.A. 8-1567. The complaint alleged that he operated a motor vehicle while sustaining an alcohol concentration of at least 0.08 grams of alcohol per 210 liters of breath/100 milliliters of blood and that a conviction of the offense herein shall be his second violation—in violation of K.S.A. 8-1567(a)(1). Or, in the alternative, that Cupp unlawfully operated or attempted to operate a motor vehicle while under the influence of alcohol to a degree that rendered him incapable of safely driving a vehicle and that a conviction of the offense herein shall be his second violation—in violation of K.S.A. 8-1567(a)(3).

At trial, the jury was given a verdict form that included both "Count 1" and "In The Alternative Count 1." And jury instruction No. 10 read:

"The defendant is charged in the alternative with[:]

"The defendant is charged with operating a vehicle while the alcohol concentration is .08 or more

"OR

"The defendant is charged with operating a vehicle while under the influence of alcohol to a degree that rendered him incapable of safely driving a vehicle.

"You are instructed that the alternative charges constitute one crime.

"You should consider if the defendant is guilty of operating a vehicle while the alcohol concentration is .08 or more and sign the verdict upon which you agree.

"You should further consider if the defendant is guilty of operating a vehicle while under the influence of alcohol to a degree that rendered him incapable of safely driving a vehicle and sign the verdict upon which you agree."

This jury instruction tracks PIK Crim. 4th 66.030 (2019 Supp.). Authority for instructions in the alternative is found in *State v. McCowan*, 226 Kan. 752, 764, 602 P.2d 1363 (1979) and *State v. Jackson*, 223 Kan. 554, 556-57, 575 P.2d 536 (1978).

After deliberation, the jury returned the verdict form with both Count 1 and Alternative Count 1 signed as guilty. The district court polled the jury, and each juror

19

indicated this reflected his or her verdict. The court then verified with the presiding juror that the jury was unanimous on the original count and the alternative count. After the jury was dismissed, the court entered judgment on Count 1—operating a vehicle while the alcohol concentration is 0.08 or more in violation of K.S.A. 8-1567(a)(1). The district judge elaborated:

> "So I'm going to enter judgment on the record. As you heard the jury unanimously found that the [S]tate had met its burden of proof with regard to Count 1 and the alternative of Count 1.
> "Because the alternative was the second charge the Court is going to enter judgment on Count 1 and that would be that I'm finding the defendant guilty of driving under the influence of alcohol or drugs and, of course, the reference in Count 1 is to the .08 grams of alcohol language.
> "But for the record in the event we have any issue in the future with this the jury had also found unanimously that the defendant was guilty to the alternative Count 1, but because you can only constitute a single crime, the Court will only find the defendant guilty in the original Count 1."

In light of the verdict form and instruction used, and the district court's actions post-verdict, Cupp's argument is unpersuasive. This jury instruction and jury verdict form were factually appropriate because they match the elements of the crimes charged and the evidence presented at trial. Further, there are no legal inaccuracies. Two convictions for alternatively charged counts "should merge by operation of law . . . and result in one conviction." *State v. Vargas*, 313 Kan. 866, 873, 492 P.3d 412 (2021). Therefore, "[w]hen a jury returns guilty verdicts on two alternatively charged counts, a district court may enter only one conviction." 313 Kan. 866, Syl. ¶ 2; see *State v. Berkstresser*, 316 Kan. 597, 607, 520 P.3d 718 (2022).

Such merger is precisely what occurred here, and the district court explicitly addressed this issue on the record, entering a conviction only on Count 1. There was no

legal error in the jury verdict form or subsequent actions of the district court. And, because there were no factual or legal errors in the jury verdict form and accompanying jury instruction, there can be no clear error.

### DID THE DISTRICT COURT ERR BY DENYING CUPP'S MOTION FOR ACQUITTAL?

In Cupp's fourth and final argument, he asserts the district court erred in denying his motion for judgment of acquittal or, in the alternative, a new trial because the evidence presented by the State was insufficient to establish his guilt. The State argues that the district court correctly denied this motion because a rational fact-finder could fairly conclude from the circumstantial evidence that Cupp was driving under the influence of alcohol when his single-vehicle accident occurred.

On appeal, although Cupp's issue statement and the standard of review noted in his brief mention the denial of his alternative motion for a new trial, he does not discuss it further. Cupp's substantive arguments focus on his motion for judgment of acquittal, specifically arguing that insufficient evidence supported his DUI conviction. As such, we may only consider that portion of his motion and the district court's related ruling because points raised incidentally in a brief and not argued therein are deemed waived or abandoned. *Meggerson*, 312 Kan. at 246.

*Applicable Legal Principles*

We review the denial of Cupp's motion for acquittal based on insufficient evidence under the same well-known standard we apply to sufficiency of the evidence challenges. *State v. Dinh Loc Ta*, 296 Kan. 230, 236, 290 P.3d 652 (2012); *State v. Lewis*, 27 Kan. App. 2d 380, 387, 5 P.3d 531 (2000).

21

When the sufficiency of the evidence supporting a criminal conviction is disputed, the appellate court reviews "'the evidence in a light most favorable to the State to determine whether a rational fact-finder could have found the defendant guilty beyond a reasonable doubt.'" *State v. Aguirre*, 313 Kan. 189, 209, 485 P.3d 576 (2021). While reviewing the evidence, an appellate court will not "reweigh evidence, resolve conflicts in the evidence, or pass on the credibility of witnesses." *State v. Potts*, 304 Kan. 687, 694, 374 P.3d 639 (2016).

A conviction of even the most serious offense can be based entirely on circumstantial evidence. *State v. Pattillo*, 311 Kan. 995, 1003, 469 P.3d 1250 (2020); see *State v. Colson*, 312 Kan. 739, 750, 480 P.3d 167 (2021) (verdict may be supported by circumstantial evidence if such evidence provides a basis for a reasonable inference by the fact-finder regarding the fact in issue); see also *Potts*, 304 Kan. at 694 ("'A conviction of even the gravest offense can be based entirely on circumstantial evidence and the inferences fairly deducible therefrom. If an inference is a reasonable one, the jury has the right to make the inference.' [Citation omitted.]"). Circumstantial evidence, to be sufficient, need not exclude every other reasonable conclusion. *Colson*, 312 Kan. at 750.

Overturning a conviction for insufficient evidence "is a high burden, and only when the testimony is so incredible that no reasonable fact-finder could find guilt beyond a reasonable doubt should we reverse a guilty verdict." *Meggerson*, 312 Kan. at 247.

*Sufficient Evidence Supported Cupp's DUI Conviction*

At the close of the State's case, Cupp moved for a directed verdict, arguing there was insufficient evidence to support that he was operating the vehicle, and there was no established timeline of when the alcohol may have been consumed and when the vehicle was operated. The State argued there was sufficient circumstantial evidence to allow the case to go to the jury. The district judge held:

22

"I am going to find the state has made a prima facie case. While there was no direct evidence of someone observing the defendant driving there was certainly circumstantial evidence a jury could use to find him guilty and all the elements have been met. I'm going to respectfully deny the motion for directed verdict."

After trial, Cupp again raised this argument in his motion for judgment of acquittal. In denying Cupp's motion, the district judge held:

"[F]irst with regard to the sufficiency of evidence argument, which is related to the testimony of Deputy Milburn, that the accident was remote, etc., you know, the jury was able to resolve all factual issues through their verdict, and I do find that the evidence on the record is sufficient to support the conviction in this case."

We agree with the district court and conclude that sufficient evidence backed Cupp's DUI conviction. Under K.S.A. 8-1567(a)(1), an individual is guilty of DUI if he or she is "operating or attempting to operate any vehicle within this state while: (1) The alcohol concentration in the person's blood or breath as shown by any competent evidence, including other competent evidence, as defined in K.S.A. 8-1013(f)(1), and amendments thereto, is 0.08 or more."

Here, viewing the evidence in the light most favorable to the State, we have little trouble determining the evidence was sufficient to support the verdict. As previously stated, when Deputy Milburn arrived at the single-vehicle accident and opened the wrecked truck's door, he found Cupp lying across the truck's bench seat, with his head toward the passenger's side but his feet toward the driver's side and actually under the steering wheel, near the pedals. Bodycam video evidence and testimony by the deputies showed Cupp's position, and that he was unresponsive, if not unconscious. An open container of beer, which was still cool, was in the cab of the truck, and Cupp's breath smelled of alcohol. Lab testing of Cupp's blood sample confirmed the officers' suspicions of DUI, as Cupp's BAC was well over the legal limit.

23

Cupp testified that an acquaintance drove the truck and left the scene of the accident. The jury was under no obligation to believe Cupp's testimony, and its verdict reveals it did not. See *State v. Aikins*, 261 Kan. 346, 392, 932 P.2d 408 (1997) (the "'jury is not bound to accept the defendant's version of the [facts] in question and, having convicted the defendant, the jury is presumed to have believed the State's evidence and to have drawn from it all inferences favorable to the State'"), *rev'd on other grounds by State v. Warrior*, 294 Kan. 484, 277 P.3d 1111 (2012).

On appeal, Cupp makes a great deal of the facts that his glasses and smudge on the dash were toward the passenger's side. Yet, Cupp was not wearing a seatbelt when officers arrived, and there is a reasonable possibility that Cupp's body could have been flung to the passenger's side during the accident. Again, the jury, as fact-finder, was entitled to weigh the evidence presented—and we, as the appellate court, are not.

Our Supreme Court collected other Kansas DUI cases and compared various factual scenarios in *State v. Darrow*, 304 Kan. 710, 374 P.3d 673 (2016) (discussing, *inter alia*, *State v. Kendall*, 274 Kan. 1003, 1009, 58 P.3d 660 [2002], and *State v. Sprague*, No. 105,827, 2012 WL 3822625 [Kan. App. 2012] [unpublished opinion], although all three cases focused on the "attempt to operate" portion of another section of the DUI statute, K.S.A. 8-1567[a][3]). In *Darrow*, the court found that circumstantial evidence presented within the parties' stipulated facts was sufficient to find Darrow guilty of DUI. Darrow was discovered "passed out" in the driver's seat with the car running although not moving, and when the officers asked her to turn the vehicle off, she fumbled with the gear shift, but the car did not move from "park." 304 Kan. at 718. When viewing the evidence in the light most favorable to the State, the court found that the State showed Darrow's vehicle was ready to move, she had placed herself in a position necessary to make the car move, and when fumbling with the gear shift, she made an overt act toward engaging the transmission. Even though those facts presented a "close case," the court noted it was "not afforded the luxury of deciding this case on the basis of the inferences

24

we would have found most persuasive as a factfinder"; rather, it was "compelled to sustain the integrity of the factfinder's determination." 304 Kan. at 720. As in *Darrow*, we cannot weigh the evidence here, but when viewing the facts in the light most favorable to the State, are compelled to find sufficient evidence upheld the jury's verdict, so the district court did not err in denying Cupp's motion for judgment of acquittal.

CONCLUSION

Cupp fails to persuade us that any of his four claims of error on appeal justify reversal of the district court. We therefore affirm Cupp's conviction.

Affirmed.